## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| EDWARD PETERS, Individually and On Behalf of All Others Similarly Situated,<br><br>                              Plaintiff,<br><br>     vs.<br><br>OPTIONABLE, INC., MARK NORDLICHT, KEVIN P. CASSIDY, EDWARD J. O'CONNOR, ALBERT HELMIG, and MARC-ANDRE BOISSEAU,<br><br>                              Defendants. | **CIVIL ACTION NO. 07-cv-3877**<br><br>CLASS ACTION COMPLAINT<br><br>**JURY TRIAL DEMANDED** |

Plaintiff, Edward Peters ("Plaintiff"), alleges the following based upon the investigation by Plaintiff's counsel, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Optionable, Inc. ("Optionable" or the "Company"), securities analysts' reports and advisories about the Company, and information readily available on the Internet, and Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

### NATURE OF THE ACTION AND OVERVIEW

1.      This is a federal class action on behalf of purchasers of the common stock of Optionable between May 9, 2005 and May 10, 2007, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.     Optionable is a provider of natural gas and other energy derivatives trading and brokerage services.  The company provides its services to brokerage firms, financial institutions, energy traders and hedge funds nationwide.

3.     During the Class Period, the defendants and other Company insiders took advantage of the artificially increased value of the Company's common stock.  On April 10, 2007, the defendants issued a statement announcing that NYMEX Holdings, Inc., a reputable and leading provider of financial services to the energy and metals industries, had acquired 19 percent of the Company, with an option to increase its ownership stake to 40 percent.  On this same day, Defendants Cassidy, O'Conner and Nordlicht took advantage of the increased price of the Company's stock, and sold over 10.7 million shares of Company stock for gross proceeds in excess of $28.9 million.

4.     Less than three weeks after the Company insiders sold their stock, Optionable's fraudulent scheme started to unravel.  The first indication was on April 27, 2007, when Bank of Montreal ("BMO") informed investors that it had lost between $350 million and $450 million in trading losses through Optionable.  BMO's CEO stated that the "commodity trading losses were the result of decisions that did not adequately recognize the vulnerability of the portfolio to changes in market volatility. We are conducting a thorough review and actions have been taken to address the current situation and reduce the likelihood of a recurrence. The commodity trading losses are particularly disappointing as our company continues to experience good operating momentum."

5.     In response to this statement by BMO, shares of the Company's dropped $1.45 per share, or 20.96 percent, to close on April 27, 2007 at $5.56 per share, on unusually heavy trading volume.

6.     On the next trading day, April 30, 2007, *TheStreet.com* published an article which further revealed that Optionable stated in a recent federal filing that "BMO accounted for 24% of net revenue last year.  But that figure could significantly understate the extent of Optionable's dependence on [BMO], its largest customer, for business.  Optionable is in the business of finding so-called counterparties for energy trades – meaning it matches buyers with sellers. The broker charges a commission to both parties.  A spokesman says counterparty deals represent 75% of Optionable's trading revenue. In such transactions, revenue from any given party represents just half of the company's potential revenues. That's a key point in assessing Optionable's dependence on BMO."  In sum, trading deals involving BMO actually accounted for 86% of the Company's brokerage fees.

7.     On May 8, 2007, BMO updated its investigation into the massive trading losses that it had incurred by trading through Optionable.  BMO revealed that it was immediately suspending all of its business relationships with Optionable pending the results of a full external review.  BMO also confirmed that two of its commodity trading professionals were placed on leave pending the full results of the review.

8.     The following day, on May 9, 2007, Optionable disclosed additional developments in connection with the Company's relationship with BMO.  The Company admitted that "BMO has accounted for a significant portion of the Company's revenues." Further, the Company believed that "it is likely that BMO's statement and suspension will have an adverse effect on the Company's business, including its future results of operations and financial condition. The Company is unable to quantify the impact of BMO's statement and suspension at this time."

9.     On this news, shares of the Company's stock fell an additional $1.83 per share, or

over 39 percent, to close on May 9, 2007 at $2.81 per share, on heavy trading volume.

10.    Then on May 10, 2007, the Canadian *National Post* published a story revealing that the decision by BMO to act decisively was based on a harsh report it had received from its forensic auditors, Deloitte and Touche, into the activity of BMO's commodities traders.  Deloitte found there had been "serious mismarking of the book of natural-gas options."  The forensic auditors indicated they had "never seen such a wide discrepancy in terms of pricing between the values marked in BMO's portfolio of natural-gas options and their market value."  The Deloitte report also indicated that prices used in BMO's mismarked book of trades were provided by Optionable.  Additionally, sources close to BMO's suspended trader revealed that the trader "had a close personal relationship with the senior management of Optionable, including Kevin Cassidy, the chief executive."

11.    On this news, shares of the Company's stock fell an additional $1.96 per share, or 70 percent, to close on May 10, 2007 at $0.85 per share, on heavy trading volume.

12.    Finally, on May 12, 2007 the Company accepted the resignation, effective immediately, of its former Chief Executive Officer, Vice Chairman and Director, Defendant Kevin Cassidy.   The media reported that Defendant Cassidy's decision was prompted after questions surfaced about his role in a payment scam in the early 1990's that defrauded the U.S. government, and led to him receiving a six-month jail sentence for tax evasion, and 30 months for credit card fraud.

13.    The cumulative loss of value to the Company's shares while these revelations were disclosed to investors is $6.16 per share, or over 87 percent of their value, from the stock's close on April 26, 2007 of $7.01 per share to its close on May 10, 2007 of $0.85 per share.

14.    The Complaint alleges that, throughout the Class Period, defendants failed to

disclose material adverse facts about the Company's financial well-being, business relationships, and prospects. Specifically, defendants failed to disclose or indicate the following: (1) that the Company was engaging in improper deals with commodities traders at BMO; (2) that the percentage of revenue that the Company generated from BMO was not 20 – 30 percent as represented, but rather well above 80 percent; (3) that the Company's exposure to potential loss of revenue from BMO was exponentially more than the defendants represented; (4) that the Company's CEO, Defendant Cassidy, had served time in prison for credit card fraud and tax evasion, and that the Company's only purported independent director, Defendant Albert Helmig, was actually a related party and board member of Platinum Energy, a company with ties to Optionable; and (5) that the Company lacked adequate internal and financial controls.

15.    As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common stock, Plaintiff and other Class Members have suffered significant losses and damages.

## JURISDICTION AND VENUE

16.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

17.    This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

18.    Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b). Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this Judicial District.

19.    In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

20.    Plaintiff, Edward Peters, as set forth in the accompanying certification, incorporated by reference herein, purchased Optionable's common stock at artificially inflated prices during the Class Period and has been damaged thereby.

21.    Defendant Optionable is a Delaware corporation with its principal place of business located at 465 Columbus Avenue, Valhalla, New York.

22.    Defendant Mark Nordlicht ("Nordlicht") was, at all relevant times, the Company's Chairman of the Board of Directors.

23.    Kevin P. Cassidy ("Cassidy") was, at all relevant times, the Company's Chief Executive Officer ("CEO"), Vice Chairman, and member of the Board of Directors.

24.    Defendant Edward J. O'Connor ("O'Connor") was, at all relevant times, the Company's President and a member of the Board of Directors.

25.    Defendant Albert Helmig ("Helmig") was, at all relevant times, a member of the Company's Board of Directors.

26.    Defendant Marc-Andre Boisseau ("Boisseau") was, at all relevant times, the Company's Chief Financial Officer ("CFO").

27.    Defendants Nordlicht, Cassidy, O'Connor, Helmig, and Boisseau are collectively referred to hereinafter as the "Individual Defendants."  The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of

Optionable's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market.  Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and misleading.  The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## SUBSTANTIVE ALLEGATIONS

### Background

28.    Optionable is a provider of natural gas and other energy derivatives trading and brokerage services.  The company provides its services to brokerage firms, financial institutions, energy traders and hedge funds nationwide.    Prior to, and throughout the Class Period, Optionable represented to investors that it adhered to a Code of Business Conduct, and ethical guidelines, especially by its CEO and other executives.  The Company also represented that while Bank of Montreal ("BMO") was its largest customer, it only represented between 10 – 30% of the Company's revenues.  As such, investors were lead to believe that if there was ever a severance in business relations between the Company and BMO, the Company would not be overly harmed by a tremendous loss of revenue.  Throughout the Class Period, the Company

generated significant revenue from BMO, and in response, shares of the Company's stock significantly increased.

**Materially False and Misleading**
**Statements Issued During the Class Period**

29.    The Class Period begins on May 9, 2005.   On this day, Optionable filed a Prospectus with the SEC in connection with the Company's Initial Public Offering ("IPO" or the "Offering").   Therein, the Company, in relevant part, stated:

**CUSTOMER CONCENTRATION**

One of our customers, Bank of Montreal, accounted for approximately 10% of our revenues during 2004. Two of our customers, Bank of Montreal and Coral Energy Holding, L.P., accounted for approximately 17% and 10%, respectively, of our revenues during 2003.

* * *

Customer Concentration

Two of the Company's customers accounted for approximately 10% and 4%, respectively of its revenues during 2004 and 18% and 11% respectively, of its revenues during 2003. The Company minimizes its customer concentration risks by diversifying its existing customer base.

* * *

**BUSINESS**

Generally, the nature and mechanics of our business is to inquire of our clients needs in the trade of energy options, swaps, and futures. Once we understand their needs: in the case of NYMEX futures or options, the trade is presented on the NYMEX through CES; and in the case of OTC swaps and options, we inquire of other clients whether they are interested in participating in such transaction.

Once the counterparties agree on a certain trade, we match the counterparties and consummate the trade by (i) in the case of a bilateral OTC trade, by confirming the details of the executed trade with both counterparties or (ii) in the case of a cleared trade, by submitting such trade to an exchange.

Presently, OTC brokerage is facilitated by brokering trades between our clients via telephone and electronic messaging, often referred to as voice brokerage. By building a relationship with their customers, our brokers learn about their customers' interests and are able to insure that traders can focus on the opportunities their customers will want to exploit. We intend to combine traditional voice brokerage with electronic trading by offering a hybrid combination of voice and electronic transactions; customers will be able to move between voice and electronic trading with no loss in liquidity. They will be able to transact in the same markets, regardless of whether or not they entered orders electronically or through a broker We aim to provide a bridge between OTC options and electronic trading.

We generate revenues by charging commission fees based on the transactions we broker on behalf of our clients. We also receive incentives from the Intercontinental Exchange ("ICE") and the New York Mercantile Exchange ("NYMEX"). The incentives are earned based on a percentage of the total revenues received by the exchange attributable to our volume of transactions submitted to the respective exchanges. Furthermore, we generate revenues from CES floor brokerage operations, which are commission fees based on transactions they broker on behalf of their clients. In return for such floor brokerage revenues from CES, we assume all associated expenses incurred by CES, including brokerage commissions paid by CES to its employees. We anticipate that revenues generated from OPEX services will be earned similarly to the method by which we generate revenues when providing voice-brokerage services.

* * *

**HOW WE OPERATE**

Our OTC brokerage operations are conducted from our Briarcliff Manor, New York, office and our floor operations are conducted from the floor of the New York Mercantile Exchange. We have five employees and one consultant, Kevin Cassidy, at the Briarcliff Manor location, and three employees at the NYMEX location who interact heavily with our existing and potential clients. Generally, the nature and mechanics of our business is to inquire of our clients needs in the trade of energy options, swaps, and futures. Once we understand their needs: in the case of NYMEX futures or options, the trade is presented on the NYMEX through CES; and in the case of OTC swaps and options, we inquire of other clients whether they are interested in participating in such transaction. Once the counterparties agree on a certain trade, we match the counterparties

and consummate the trade by (i) in the case of a bilateral OTC trade, by confirming the details of the executed trade with both counterparties or (ii) in the case of a cleared trade, by submitting such trade to an exchange.

We rely heavily on communication technology to interact with our clients, whether by phone, e-mail, and/or instant messaging. We anticipate that, in the future, we will further rely on Internet based communications for the operation of OPEX.

We keep abreast of conditions in the natural gas trading market by receiving information using a combination of technology, such as trading software, relevant business news from different wiring services and traditional broadcast as well as leveraging the presence of OPEX employees on the floor of the NYMEX.

30.     On May 26, 2005, the Company filed its Quarterly Report with the SEC on Form

–QSB.  Therein, the Company, in relevant part, stated:

### CONTROLS AND PROCEDURES

Our chief executive officer and our chief financial officer (the "Certifying Officers") are responsible for establishing and maintaining disclosure controls and procedures for our Company. Such officers have concluded (based upon their evaluations of these controls and procedures as of the end of the period covered by this report) that our disclosure controls and procedures are effective to ensure that information required to be disclosed by us in this report is recorded, processed, summarized, and reported in a timely manner.

The Certifying Officers have also indicated that there were no significant changes in our internal controls over financial reporting or other factors that could significantly affect such controls subsequent to the date of their evaluation, and there were no significant deficiencies and material weaknesses…

31.    March 15, 2006, the Company filed its Annual Report with the SEC on Form 10-KSB.  The Company's Form 10-KSB was signed by the Individual Defendants, and stated, in relevant part:

### CLIENT CONCENTRATION

One of our clients, Bank of Montreal, accounted for 18% and 10% of our revenues during 2005 and 2004, respectively.

32.    On July 25, 2006, the Company issued a press release entitled "Optionable Reports Record Results and Strong Growth For Second Quarter 2006."  Therein, the Company, in relevant part, stated:

Optionable, Inc. (OTCBB: OPBL), a rapidly growing provider of natural gas and other energy derivatives brokerage services, today announced record results from operations for the quarter ended June 30, 2006.

Revenues for the quarter ended June 30, 2006 increased 94% to $2,476,664 from $1,277,984 for the quarter ended June 30, 2005. Net income for the quarter increased 304% to $668,547 compared to $165,289 for the second quarter of 2005. Diluted earnings per common share increased to $0.01 per share, on 52,465,725 diluted shares, for the second quarter of 2006, versus $0.00 per share, on 51,406,431 diluted shares, for the second quarter of 2005.

"We are pleased to be able to report continued strong year over year growth in the volume of options traded along with the growing demand for our brokerage services," said Kevin Cassidy, chief executive officer of Optionable. "We continued to see strong demand for natural gas contracts even as we moved out of the traditional peak demand during the winter heating months in the northeast. Our continued growth reflects our ability to execute trades in a demanding market and provide our customers with broad access to counterparties."

For the six months ended June 30, 2006, Optionable reported revenues of $4,710,660, an increased of 93% from $2,436,786 for the first half of 2005. Net income for the six months increased 394% to $1,493,456 compared to $302,577 for the six months ended June 30, 2006. Diluted earnings per common share increased to $0.03 per share, on 52,588,678 diluted shares, for the

six months of 2006, versus $0.01 per share, on 51,406,431 diluted shares, for the first six months of 2005.

"The energy markets continue to be very active as investors look for opportunities and closely follow global events and the beginning of the hurricane season," continued Cassidy. "We believe that these factors will continue to contribute to volume growth in the energy derivatives market and that Optionable is well positioned with the expertise needed to trade in these increasingly complex markets. At the beginning of the third quarter, OPEX our electronic trading platform was launched. We are confident that it will provide a strong market advantage tool for customers seeking visibility and new opportunities to trade natural gas contracts."

33.    On October 25, 2006, the Company issued a press release entitled "Optionable Inc Reports Record Results for the 2006 Third Quarter, First Nine Months."  Therein, the Company, in relevant part, stated:

> Optionable, Inc. (OTC Bulletin Board: OPBL), a leading provider of natural gas and other energy derivatives brokerage services, announced today record results from operations for its third quarter and nine months ended September 30, 2006, posting strong gains in revenue, net income and EPS. The Company said that revenues increased 166 percent and 123 percent, respectively, compared to prior year periods, and net income also reached all time highs, increasing 216 percent and 270 percent, respectively, from the prior year periods.
>
> Revenues for the third quarter ended September 30, 2006 were $4.5 million, up from $1.7 million for the third quarter of last year. Net income for the third quarter increased to $2.2 million, up from $694,218 for the third quarter of 2005. Gross profit increased 153 percent to $2.7 million for this year's third quarter compared to $1.1 million for the same period last year. Diluted earnings per common share increased to $0.04 per share, on 51,680,993 diluted shares, for the third quarter of 2006, versus $0.01 per share, on 51,461,963 diluted shares, for the third quarter of 2005.
>
> CEO Kevin Cassidy commented, "It is clear from the recent news headlines that there is increased interest in derivatives trading. And we feel that the best is yet to come for Optionable. Our record results for the third quarter have primarily been achieved through traditional means of service of delivery, voice-brokerage and open outcry. Our electronic platform, OPEX, which we recently introduced, will gain adherents in the energy commodities markets

and, ultimately, with other commodities markets. The latest addition to our services offering, OPEX Analytics, enables us to offer a broader variety of solutions to satisfy our clients' needs. We certainly would not be where we are without providing consistent, timely, and outstanding quality services to our clients."

For the nine months ended September 30, 2006, Optionable reported that revenues increased to $9.2 million from $4.1 million for the first nine months of last year. Net income for the 2006 first nine months increased to $3.7 million compared to $996,795 for the prior year period. Gross profit increased 156 percent to $5.4 million for the first nine months of this year compared to $2.1 million for the same period last year. Diluted earnings per common share increased to $0.07 per share, on 51,688,736 diluted shares, for this year's nine-month period, versus $0.02 per share, on 51,449,427 diluted shares, for comparable period last year. As of September 30, 2006, the Company had cash and cash equivalents of $4.4 million.

34.    On February 6, 2007, the Company issued a press release entitled "Optionable Reports Record Results for the 2006 Fourth Quarter and Full Year; Revenue and Net Income Increase to All Time Highs."  Therein, the Company, in relevant part, stated:

Optionable, Inc. (OTC Bulletin Board: OPBL), a leading provider of natural gas and other energy derivatives brokerage services, announced today record results for its fourth quarter and year ended December 31, 2006. The Company said that revenues increased 310 percent for the fourth quarter and 177 percent for the full year compared to prior-year periods, and net income reached all-time highs, increasing 859 percent for the fourth quarter and 393 percent for the full year compared to prior-year periods.

Revenues for the fourth quarter ended December 31, 2006, were $6.8 million, with net income of $2.5 million, or $0.05 per diluted share, up from $1.7 million in revenue, and net income of $262,769, or $0.01 per diluted share, for the fourth quarter of 2005. Operating margin increased to 58 percent for this year's fourth quarter up from 19 percent for the fourth quarter of 2005. The weighted average number of diluted common shares used in the computations was 53,020,901 and 51,750,647 for the fourth quarter of 2006 and of 2005, respectively.

Commenting on the results, Optionable CEO Kevin Cassidy said, "2006 was a benchmark year for us, with the launch of our electronic trading platform, OPEX(R), as well as our Analytics

service. We're particularly happy with these results as they are due almost entirely to our customers' positive response to the innovative and impeccable service we delivered to them. These results also demonstrate a very healthy and largely untapped market for our derivative brokerage services.

"The results for the quarter and the year were driven primarily by our voice-brokerage and open outcry service; however, OPEX, which we launched in July 2006, is beginning to add to our overall revenue mix. We expect that the efficiency of OPEX in executing trades, will cause its contribution to revenue to become a substantial portion of the mix as we progress into 2007 and even 2008, particularly as we begin to open up the market for our services."

Cassidy continued, "We intend to build on the success we've enjoyed to date, adding products and services beyond our capabilities in the energy derivative market and Analytics. We intend to look at expanding our relationship with NYMEX, and increase the traction of OPEX. In short, there are a number of strategic opportunities in front of us and we will examine each one thoroughly and carefully in order to continue building Optionable into a force in the derivatives brokerage business.

"During the past year we experimented with releasing the number of contracts traded on a monthly basis, but at this point we feel the information is more meaningful when it is part of a quarterly earnings release."

Revenues for the year ended December 31, 2006, were $16.1 million, with net income of $6.2 million, or $0.12 per diluted share, up from $5.8 million in revenues with net income of $1.3 million, or $0.02 per diluted share. Operating margin increased to 52 percent for 2006, up from 26 percent for 2005. The weighted average number of diluted common shares used in the computations was 52,559,445 for 2006 and 51,524,732 for 2005. As of December 31, 2006, the Company had cash and cash equivalents of $7.9 million.

35.     On March 9, 2007, the Company issued a press release entitled "Optionable Announces Trading of Swap Contracts on OPEX(R)."  Therein, the Company, in relevant part, stated:

Optionable, Inc. (OTC Bulletin Board: OPBL), a leading provider of natural gas and other energy derivatives brokerage services,

announced the availability of seven new swap contracts on its OPEX platform.

Optionable President Edward O'Connor said, "We believe that the addition of the swap contracts is a logical extension and outgrowth of our trading services business. We are continuously executing our strategy and diversifying our product line to help our clients maximize the opportunities in the market. By adding the swaps contracts to our platform, it will allow our customers a wider variety of trading products and provide greater volume of trading.

"The response to OPEX continues to be quite strong and we expect that the addition of the swaps contracts will further spur demand to trade through our OPEX platform."

The Company said that the swaps contracts that can be traded through the award-winning NYMEX ClearPort(R) clearing system are Henry Hub Natural Gas Swap, West Texas Intermediate Crude Oil Calendar Swap, WTI Bullet Swap (crude oil), New York Harbor Heating Oil Calendar Swap, Heating Oil Financial Futures, RBOB Bullet Swap (reformulated gasoline), and RBOB Calendar Swap (reformulated gasoline).

36.     On March 23, 2007, Optionable filed its Annual Report with the SEC on Form 10-KSB for the year ended December 31, 2006.  The Company's Form 10-KSB was signed by the Individual Defendants, and stated, in relevant part:

**CLIENT CONCENTRATION**

One of our clients, Bank of Montreal, accounted for 24% and 18% of our revenues during 2006 and 2005, respectively.

* * *

Customer Concentration

One of the Company's customers accounted for approximately 24% and 18%, respectively of its revenues during 2006 and 2005, respectively. The Company minimizes its customer concentration risks by diversifying its existing customer base.

* * *

**CONTROLS AND PROCEDURES**

Our Chief Executive Officer and Chief Financial Officer (collectively, the "Certifying Officers") are responsible for establishing and maintaining disclosure controls and procedures which include controls and procedures that are designed to ensure that information required to be disclosed in the reports which we file with or submit to the SEC is recorded, processed, summarized and reported within the time periods specified by the SEC. The Certifying Officers have evaluated these controls and procedures and they have concluded (based upon their evaluation of these controls and procedures as of the end of the period covered by this report) that our disclosure controls and procedures are effective to: i) ensure that information required to be disclosed by us in this report is accumulated and communicated to management, including our principal executive officers as appropriate, to allow timely decisions regarding required disclosure; and ii) ensure that information required to be disclosed in the reports which we file or submit with the SEC is recorded, processed, summarized and reported within the time periods specified by the SEC.

The Certifying Officers have indicated that there were no changes in our internal controls which occurred during our last fiscal quarter that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting, and there were no corrective actions with regard to significant deficiencies and material weaknesses.

37. Also, the Company's Form 10-KSB contained a "Code of Business Conduct and Ethics," which the Company and the Individual Defendants represented that executives and employees adhered to. The Company, in relevant part, stated:

We have adopted a Code of Business Conduct and Ethics to provide guiding principles to all of our employees. Our Code of Business Conduct and Ethics does not cover every issue that may arise, but it sets out basic principles to guide our employees and provides that all of our employees must conduct themselves accordingly and seek to avoid even the appearance of improper behavior. Any employee which violates our Code of Business Conduct and Ethics will be subject to disciplinary action, up to an including termination of his or her employment.

Generally, our Code of Business Conduct and Ethics provides guidelines regarding:

- compliance with laws, rules and regulations,

- conflicts of interest,

- insider trading,

- corporate opportunities,

- competition and fair dealing,

- discrimination and harassment,

- health and safety,

- record keeping,

- confidentiality,

- protection and proper use of company assets,

- payments to government personnel,

- waivers of the Code of Business Conduct and Ethics,

- reporting any illegal or unethical behavior, and

- compliance procedures.

In addition, we have also adopted a Code of Ethics for our Chief Executive Officer and Senior Financial Officers. In addition to our Code of Business Conduct and Ethics, our CEO and senior financial officers are also subject to specific policies regarding:

- disclosures made in our filings with the SEC,

- deficiencies in internal controls or fraud involving management or other employees who have a significant role in our financial reporting, disclosure or internal controls,

- conflicts of interests, and

- knowledge of material violations of securities or other laws, rules or regulations to which we are subject.

38. Additionally, the Company's Form 10-KSB contained Sarbanes-Oxley required certifications, signed by the Defendant Cassidy, which stated:

> I, [Kevin Cassidy / Marc-Andre Boisseau], certify that:
>
> 1. I have reviewed this Annual Report on Form 10-KSB of the Company for the fiscal year ended December 31, 2006;
>
> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the small business issuer as of, and for, the periods presented in this report;
>
> 4. The small business issuer's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the small business issuer and have:
>
>> (a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the small business issuer, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
>>
>> (b) evaluated the effectiveness of the small business issuer's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
>>
>> (c) disclosed in this report any change in the small business issuer's internal control over financial reporting that occurred during the small business issuer's most recent fiscal quarter (the small business issuer's fourth fiscal quarter in the case of an annual

report) that has materially affected, or is reasonably likely to materially affect, the small business issuer's internal control over financial reporting; and

5. The small business issuer's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the small business issuer's auditors and audit committee of the small business issuer's board of directors (or persons performing the equivalent functions):

   (a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the small business issuer's ability to record, process, summarize and report financial information; and

   (b) any fraud, whether or not material, that involves management or other employees who have a significant role in the small business issuer's internal control over financial reporting.

* * *

In connection with the Annual Report on Form 10-KSB of Optionable, Inc. (the "Company") for the fiscal year ended December 31, 2006, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), [Kevin Cassidy / Marc-Andre Boisseau] certifies, pursuant to 18 U.S.C. Section 1350:

   (1) The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

   (2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

39.    On April 10, 2007, the Company issued a press release entitled "Optionable Announces Completion of Transaction for NYMEX Holdings to Purchase 19 Percent of Optionable Shares." Therein, the Company, in relevant part, stated:

Optionable, Inc. (OTC Bulletin Board: OPBL) ("Optionable" or the "Company"), a leading provider of natural gas and other energy derivatives brokerage services, announced that pursuant to the

binding term sheet announced on January 22, with three of its founding stockholders, have completed and signed definitive agreements with NYMEX Holdings, Inc. (NYSE: NMX) ("NYMEX"), pursuant to which NYMEX has acquired 19 percent of Optionable.

In addition to the 19 percent stake in Optionable acquired by NYMEX from the founders, the Company has issued a warrant to NYMEX that would permit NYMEX to increase its stake in the Company to 40%. The warrant is exercisable for 18 months at an exercise price of $4.30 per share. The agreements also provide for certain marketing and technology initiatives between the Company and NYMEX.

Pursuant to the definitive agreements, NYMEX is entitled to nominate one Director to Optionable's Board. The Company has increased the size of its Board from four Directors to five and elected Benjamin Chesir, NYMEX vice president of new product development, as a Director.

Optionable CEO Kevin Cassidy said, "The completion of this transaction is a major strategic step for the Company, allying us closely with the world's largest exchange for the trading of energy futures and options contracts. I am convinced that our close relationship with NYMEX will be an important catalyst in helping drive and accelerate our future growth."

NYMEX Chairman Richard Schaeffer said, "The closing of this agreement marks an important milestone for NYMEX. We are looking forward to working with Optionable as a key contributor to our future expansion in options markets."

40.    On April 23, 2007, the Company issued a press release entitled "Optionable Expands Trading With New Products on OPEX(R)."  Therein, the Company, in relevant part, stated:

Optionable, Inc. (OTC Bulletin Board: OPBL), a leading provider of natural gas and other energy derivatives brokerage services, announced the availability of new products on its electronic trading OPEX platform. American-style options on natural gas (ON), RBOB gasoline (OB), heating oil (OH), will be available to trade on OPEX on May 7, 2007. Dubai Crude Oil Calendar Swap Futures (Platts) (DC), will be available to trade on Monday, April 23, 2007.

"The electronic trading continues to grow thanks to the increase acceptance and accessibility. The portion of light sweet crude oil options traded on OPEX last week was approximately 3% of NYMEX total volume for such options," said Optionable President Edward O'Connor. "We will continue to add products to OPEX to serve the needs of our clients."

American-style options are contracts that may be exercised at any time before expiration. They differ from European-style options contracts, which may be exercised only on the expiration date.

41.     The statements contained in ¶¶ 29 – 40 were materially false and misleading when made because Defendants failed to disclose or indicate the following: (1) that the Company was engaging in improper deals with commodities traders at BMO; (2) that the percentage of revenue that the Company generated from BMO was not 20 – 30 percent as represented, but rather well above 80 percent; (3) that the Company's exposure to potential loss of revenue from BMO was exponentially more than the defendants represented; (4) that the Company's CEO, Defendant Cassidy, had served time in prison for credit card fraud and tax evasion, and that the Company's only purported independent director, Defendant Albert Helmig, was actually a related party and board member of Platinum Energy, a company with ties to Optionable; and (5) that the Company lacked adequate internal and financial controls.

## **The Truth Begins to Emerge**

42.     On April 27, 2007, Bank of Montreal ("BMO") informed investors that it had lost between CND $350 million and $450 million in trading losses through Optionable.  In a press release entitled "BMO Financial Group To Report Mark-to-Market Commodity Trading Losses Estimated To Be Between $350 Million And $450 Million (Pre-Tax) In The Second Quarter," BMO, in relevant part, revealed:

BMO Financial Group (NYSE: BMO, TSX: BMO) said today that mark-to-market commodity trading losses estimated at between CDN$350 million and CDN$450 million, pre-tax, will be recorded in the second quarter of its 2007 fiscal year. The impact of this to

BMO Financial Group's second quarter earnings, which will be announced on May 23, 2007, is estimated in the range of 45 cents to 55 cents per share.

A number of factors contributed to these mark-to-market commodity trading losses. During the quarter, positions held by BMO Financial Group in the energy market, primarily for natural gas, were negatively impacted by changes in market conditions. In particular, the market became increasingly illiquid and volatility dropped to historically low levels. In conjunction with this, there was a refinement in BMO's approach to estimating the market value of this portfolio.

**Bill Downe, President and Chief Executive Officer of BMO Financial Group, said: "The commodity trading losses were the result of decisions that did not adequately recognize the vulnerability of the portfolio to changes in market volatility. We are conducting a thorough review and actions have been taken to address the current situation and reduce the likelihood of a recurrence. The commodity trading losses are particularly disappointing as our company continues to experience good operating momentum.** We remain committed to providing the high level of service that our clients in the energy sector have come to expect from BMO Capital Markets.["] [Emphasis added.]

43.    On this news, shares of the Optionable's stock fell $1.45 per share, or 20.6 percent, to close on April 27, 2007 at $5.56 per share, on unusually heavy trading volume.

44.    On April 30, 2007, *TheStreet.com's* Mark DeCambre published an article entitled "Optionable's BMO Bite."  Therein, Mr. DeCambre, in relevant part, revealed:

BMO Financial's natural gas blowup could yet singe commodities broker Optionable.

BMO, also known as Bank of Montreal, admitted Friday that it lost more than $300 million on natural gas trades that went bad.

Optionable, a Valhalla, N.Y., broker of energy options and derivatives trades to U.S. hedge funds and other financial institutions, said in a recent federal filing that BMO accounted for 24% of net revenue last year.

**But that figure could significantly understate the extent of Optionable's dependence on Bank of Montreal, its largest customer, for business.**

Optionable is in the business of finding so-called counterparties for energy trades -- meaning it matches buyers with sellers. The broker charges a commission to both parties.

**A spokesman says counterparty deals represent 75% of Optionable's trading revenue. In such transactions, revenue from any given party represents just half of the company's potential revenues. That's a key point in assessing Optionable's dependence on BMO.**

A look at Optionable filings from last year show that net revenue for 2006 was $16 million. Taking Optionable's 24% figure puts revenue from BMO at $3.8 million. That figure, in turn, represents 43% of the firm's $8.9 million in 2006 brokerage fees, according to filings with the Securities and Exchange Commission.

**But remember, there are two sides to any counterparty deal. So trading deals involving BMO appear to account for 86% of the firm's brokerage fees, even if half of those fees aren't actually from BMO itself.**

**An external spokesman for Optionable agrees that BMO's impact is likely more than the 24% when factoring in counterparties. He says counterparty trading, in which Optionable gets paid on both sides, represents about three-quarters of its trading revenues.** Floor trading makes up the remainder, says the spokesman, declining to provide a further breakdown of Optionable's business with BMO on the floor trades. In floor trades, brokers are only paid once, by the exchange. [Emphasis added.]

45. Despite these revelations, the defendants continued to represent to investors that the Company's current status and outlook was favorable, and they continued to downplay the significant risk that the loss of revenue from BMO represented, and painted Optionable in a flattering light. For example, on a May 1, 2007 conference call with financial analysts and investors, the defendants, in relevant part, stated:

DAVID CHAMBERLAIN, ANALYST, OPPENHEIMER CAPITAL: Hi, guys. Quick question. Can you give us any sense,

you know, obviously you've [put it out in the K] in terms of your exposure to the largest client, BMO. Can you give us a sense, in terms of the exposure, in terms of the first quarter from BMO, in terms of their revenue?

MARC-ANDRE BOISSEAU: Well, they accounted for 30% of our revenues.

DAVID CHAMBERLAIN: And is it fair to say that, the right way to look at this from your vantage point that it's more than that, the exposure's more than that because of the counter party risk? Or is that the wrong way to think about it?

ALBERT HELMIG, CHAIRMAN, OPTIONABLE INC: This is Albert Helmig. There is no counter party, because they're clear transactions.

DAVID CHAMBERLAIN: I'm sorry, not counter party risks, but in terms of overall transactions, they are- - because you, two-thirds or three-quarters of your trades are done on a counter party basis, I'm in the understanding that that, the overall exposure to transactions that are related with BMO is higher than 30%. Is that fair to say?

KEVIN CASSIDY: You really can't make a statement that way, because not all of those transactions are brokered by counter party.

* * *

LEONARD GROSS, ANALYST, G2 CAPITAL: Hi, thank you. Can you say on an absolute basis, on a dollar basis, how much of your roughly 30% in growth is attributed to the BMO?

MARC-ANDRE BOISSEAU: With the [lead] it was around 2.7 million for Q1.

* * *

LEONARD GROSS: I wanted to know if, on an absolute basis, as you look at the quarters, quarter-over-quarter, for the four quarters during the course of the year, was your share of revenues as a percent of absolute revenues with BMO, was it increasing, decreasing or staying the same?

MARC-ANDRE BOISSEAU: In dollars it was increasing. That is, historically. I'm not sure I answered your question, though.

LEONARD GROSS: Well, what I'm trying to figure out is how much of your growth is attributed to BMO. Your growth numbers are extraordinary, they're outstanding. But I'm trying to figure out how much of that growth is attributable to BMO.

MARC-ANDRE BOISSEAU: I think we have to be careful when we analyze. Just forget about BMO, but any given client in our industry. What happens is that, when two market participants enter into a trade, it doesn't mean that because one of them would not make the trade that there's not another one that would enter into it or that would enter into a similar trade. So, whether it's BMO or any other client that we have, it doesn't necessarily mean that because it's BMO or a third client that makes that trade, that we wouldn't be able to make another one with a different client. Now, I can't tell you that those would be, that we can replace any given client for a hundred percent of the trade. But there is enough market participants to enter into a trade to accommodate them.

LEONARD GROSS: So, do you feel that, based upon that, you'll be able to, if BMO shut down their entire operation, you'd be able to replace the majority, you would be able to capture the majority of the revenue you lost through other trading partners, other firms?

KEVIN CASSIDY: Well, we hope to do that and we are getting an increasing share in crude oil options, but obviously we can't guarantee that. At this point, they haven't said that they're shutting it down and they continue to do business.

LEONARD GROSS: Right. So, if BMO today ceased to exist, do you think you would still, you would be able to capture at least more than half?

MARC-ANDRE BOISSEAU: First of all, I think this is a hypothetical question. I don't think that BMO is going away. They certainly didn't indicate that they're going away. They're a solid company. They have a strong financial position.

* * *

CASEY AMBRETH, ANALYST, MILLENNIUM PARTNERS: … My first question is, considering the issues that BMO's had recently, maybe you can just give us a little color on how April, the volatility created by them has kind of trended so far in April for your business?

KEVIN CASSIDY: Yes, I don't really don't have a comment about that.

CASEY AMBRETH: Okay. I mean, is business good right now? Is it creating some volatility which is bringing new players in?

KEVIN CASSIDY: We haven't seen any trend change.

* * *

ALEXANDER FLEISS: Okay. Second question, in a New York Post on Saturday, I hate to bring this up, but they mentioned BMO not using you guys for unwinding their positions. I listened to the BMO conference call and they made it very clear that they will continue with their natural gas trading operations. It's a major money maker for them and a huge part of their business. But do you see any signs that they would not be using you in the future?

KEVIN CASSIDY: No, absolutely not.

* * *

ALEXANDER FLEISS: But you will say [that BMO is] your customers and you're still in good standing with them as of today? Because, I mean, the recent press that's come out has made it seem that they're going to pull the plug on your guys.

KEVIN CASSIDY: We're still, well, nobody's pulled the plug on us and we're, still have all of our customers.

* * *

ASHLEY KENNEDY: And sort of not to belabor the BMO issue, but I just want to try to understand it a little more. So, as far as you know, obviously, they're still doing business with you. They're still in the market. They've said that they're not closing out business or anything like that. So, do you have a sense of what they, just from your color and your contacts, what they may be doing with their operations? Would that be taking more risk off their books? Or would that be doing less transactions? And then, on the side of that, sort of, I think you touched on it before, would you expect, just as you said, somebody else to come in and fill their role in the market?

KEVIN CASSIDY: … I wouldn't want to make any other comments than what we made about BMO, except- - they made their comments. They said that they were going to stay in the business. I do believe them. I believe the same people are still there, but probably they have more, you know, supervisory around risk at this point, which is very understandable.

46.    Also on May 1, 2007, Optionable issued a press release entitled "Optionable Reports Results for First Quarter 2007; Revenue and Net Income Up 307 Percent and 276 Percent, Respectively."  Therein, the Company, in relevant part, stated:

> Optionable, Inc. (OTC Bulletin Board: OPBL), a leading provider of natural gas and other energy derivatives brokerage services, announced today results for its first quarter ended March 31, 2007. The Company said that revenues increased 307 percent for the first quarter compared to the prior-year period, and net income increased 276 percent for the first quarter as compared to the prior-year period.

> Kevin Cassidy, CEO said that the first quarter of 2007 was very active for the Company as it continued to diversify product offerings, add more depth of services, and solidify strategic alliances.

> Revenues for the first quarter ended March 31, 2007, were $9.1 million, with net income of $3.1 million, or $0.06 per diluted share, up from $2.2 million in revenue, and net income of $825,000, or $0.02 per diluted share, for the first quarter of 2006. Operating margin increased to 56 percent for this year's first quarter, up from 37 percent for the first quarter of 2006. The weighted average number of diluted common shares used in the computations was 53,996,818 and 52,609,414 for the first quarter of 2007 and of 2006, respectively.

> * * *

> Cassidy said, "We continue to add to and diversify our products line to meet the needs of our clients by offering an increased variety of energy contracts. We are particularly proud to be the first company to offer NYMEX Light Sweet Crude Oil options through an electronic platform. Crude oil is the world's most actively traded commodity, and the NYMEX Division light, sweet crude oil futures contract is the world's most liquid forum for crude oil trading, as well as the world's largest-volume futures contract trading on a physical commodity."

> * * *

> Looking ahead Cassidy said that the Company will continue to explore and evaluate possible relationships with other OTC and floor brokerage companies or the additional hiring of energy brokers in an effort to continue to grow the Company. Cassidy also

noted that the Company will consider possible future acquisition targets if appropriate.

Cassidy concluded, "If we find opportunities that are synergistic or accretive, then we will carefully evaluate them and determine what is in the best interests of the Company and its shareholders at that time."

As of March 31, 2007, the Company had cash and cash equivalents of $11.5 million.  [Emphasis added.]

47.    On this news, shares of the Company's stock declined 5.49 percent, or $0.31 per share, to close on May 1, 2007 at $5.34 per share.

48.    The following day, on May 2, 2007, Mark Nordlicht resigned from his positions as the Company's Chairman of the Board of Directors.  In a press entitled "Optionable Inc Elects New Chairman of the Board," the Company, in relevant part, stated:

Optionable Inc (OTC Bulletin Board: OPBL), a leading provider of natural gas and other energy derivatives brokerage services, announced that Albert Helmig, 55, a commodity trading veteran, has been elected Chairman of the Board. The appointment, first announced on the Company's first quarter 2007 earnings held yesterday, follows the resignation of Mark Nordlicht as Chairman, who has decided to dedicate his time and energy to his primary business enterprises. Nordlicht also resigned his position as Director.

Optionable Inc President Edward O'Connor said, "I'm pleased to announce that Albert, who has served as a Director on our Board since September 2004, was elected Chairman by a unanimous vote of the Board. Albert has more than 35 years in the commodity trading industry and is the former Vice Chairman of NYMEX. For 10 years, he served on the NYMEX Board, and on the Executive Committee, which is just one of the more than 20 committees on which he served as chair or vice-chair while on the NYMEX Board. We are very happy that Albert has accepted the position. His vast knowledge, experience, and perspective will be of great value to Optionable going forward."

Nordlicht commented on the appointment saying, "In my opinion there's no one person better able to help steer Optionable to success at this point. I've worked very closely with Albert, and everyone at Optionable, and I have enjoyed every moment. I step down

knowing that the hard work we've all put into getting this company
going will not be for naught under his leadership."

49.     On this news, shares of the Company's stock declined 9.83 percent, or $0.52 per

share, to close on May 2, 2007 at $4.81 per share.

50.     On May 8, 2007, Bank of Montreal issued a press release entitled "Updated

Statement by BMO Financial Group Related to Commodity Trading Losses."  Therein, BMO, in

relevant part, further stated:

> **BMO is suspending all of its business relationships with the
> brokerage firm, Optionable, Inc., as well as all derivatives
> trading through that firm, pending the results of a full external
> review which is ongoing.**
>
> In addition, the company said that it has changed the operating
> structure of BMO Capital Markets in order to provide additional
> oversight of the Commodities business, which now reports within a
> business line most experienced in the trading and valuation of
> derivatives.
>
> **BMO confirmed that two of its commodity trading
> professionals are on leave pending the results of the external
> review.**  [Emphasis added.]

51.     Then on May 9, 2007, the Company issued a press release entitled "Statement by

Optionable Inc."  Therein, the Company, in relevant part, stated:

> Optionable Inc, (OTCBB: OPBL), a leading provider of natural
> gas and other energy derivatives brokerage services, said today that
> one of its clients recently incurred some losses that have become a
> subject of public discussion. Albert Helmig, Optionable Chairman,
> said, "Gains and losses are both inevitable in trading energy
> derivatives. We are never pleased when losses dominate for one of
> our clients, but we do not design or help to design their strategies,
> nor are we financial advisors. We provide brokerage and execution
> services for trades that we are instructed to make by our clients.
> We believe strongly that our brokerage and execution services are
> and have been rendered appropriately, professionally and
> correctly."

52.    Also on May 9, 2007, the Company filed a Current Report with the SEC on Form 8-K to inform the Commission of recent developments in connection with the Company's relationship with BMO. In the filing with the SEC, the Company, in relevant part, revealed:

> **On May 8, 2007, BMO Financial Group ("BMO") issued a statement indicating that BMO is suspending its business relationships with Optionable, Inc. (the "Company"), as well as all derivatives trading through the Company, pending the results of an ongoing external review of certain commodity trading losses incurred by BMO. BMO has accounted for a significant portion of the Company's revenues. The Company believes that it is likely that BMO's statement and suspension will have an adverse effect on the Company's business, including its future results of operations and financial condition. The Company is unable to quantify the impact of BMO's statement and suspension at this time.**
>
> On May 9, 2007, The New York Mercantile Exchange, Inc., a subsidiary of the NYMEX Holdings, Inc., announced that it will offer options trading for crude oil, natural gas, gold, and silver on the CME Globex electronic trading platform beginning in June 2007. We believe that some of the contracts trading on the CME Globex platform may compete with contracts trading on the Company's OPEX platform. The Company is unable to quantify the impact of this potential competition on its business, including its future results of operations and financial condition. [Emphasis added.]

53.    On this news, shares of the Company's stock declined 39.44 percent, or $1.83 per share, to close on May 9, 2007 at $2.81 per share.

54.    Then on May 10, 2007, the Canadian *National Post* published a story entitled "Report Flagged BMO Loss; $450M Trading Fiasco; CEO Downe Acted on April Findings From Deloitte." Therein, the article, in relevant part, further revealed:

> The decision by Bill Downe, Bank of Montreal's new chief executive, to act decisively on its $350-million to $450-million natural gas trading blunder was the result of a tough report from forensic auditors Deloitte and Touche LLP into the activity of BMO's former star commodities trader, David Lee, it emerged yesterday.

BMO engaged Deloitte in early February and received the final report in late April.

**Deloitte found there had been "serious mismarking of the book of natural-gas options," said a source familiar with the report.**

**The forensic auditors indicated they had "never seen such a wide discrepancy in terms of pricing" between the values marked in BMO's portfolio of natural-gas options and their market value, the source said.**

**The Deloitte report also indicated that some of the prices used in BMO's mismarked book of trades were provided by Valhalla, N.Y.-based brokerage Optionable Inc., the source said.**

Based on the findings of the report, Mr. Downe went public with the losses. The CEO, who only took the reins at BMO in March, announced the losses on April 27 and spoke to banking analysts on a conference call the same day.

Mr. Downe said the bank has refined its method of estimating the value of its book and also blamed the losses on a drying up of liquidity and flattening out of natural gas prices.

**BMO has also confirmed that Mr. Lee, the man at the centre of the money-losing trades, is on a leave of absence, along with Bob Moore, the bank's executive head of commodity products. On Tuesday, BMO also said it has suspended its business relationship with Optionable.**

**Shares of the brokerage, which was dependent on Mr. Lee for as much as 30% of its revenue, have tumbled 60% since BMO announced the trading losses.**

**Sources close to Mr. Lee and Optionable say the BMO trader, widely regarded as the biggest natural-gas options trader in the market, had a close personal relationship with the senior management of Optionable, including Kevin Cassidy, the chief executive.**

**Meanwhile, the brokerage's new chairman, Albert Helmig, dismissed concerns about the loss of its biggest customer on Tuesday. "In the extreme scenario, that they go away tomorrow, someone else comes in and fills BMO's place," Mr. Helmig said.**

\* \* \*

"The Company is unable to quantify the impact of this potential competition on its business, including its future results of operations and financial condition," the Optionable statement said.

Mr. Helmig, a former vicechairman of Nymex, took over as Optionable's chairman last week following the resignation of Mark Nordlicht.

Mr. Nordlicht said his resignation was not linked to BMO's trading losses. Both Mr. Helmig and Mr. Nordlicht are also on the board of directors of Platinum Energy Resources Inc. an oil and gas business that uses hedge financing to profit from energy price volatility.  [Emphasis added.]

55.    On this news, shares of the Company's stock fell 70 percent, or $1.96 per share, to

close on May 10, 2007 at $0.85 per share, on heavy trading volume.

## POST CLASS PERIOD DISCLOSURES

56.    On May 14, 2007, the Company issued a press release entitled "Albert Helmig

Takes Reins at Optionable Inc; Kevin Cassidy Resigns."  Therein, the Company, in relevant part,

stated:

Optionable Inc (OTC Bulletin Board: OPBL), a leading provider of natural gas and other energy derivatives brokerage services, announced that Board Chairman Albert Helmig, 55, has taken over day-to-day management of the Company as Executive Chairman, effective May 11. On May 12, the Company accepted the resignation, effective immediately, of former Vice Chairman, CEO and Director, Kevin Cassidy.

Helmig said, "In my new and expanded role as Executive Chairman I am going to assess the situation and guide the Company accordingly."

57.    On May 15, 2007, the Canadian *Financial Post's* Duncan Marvin published an

article entitled "Ex-Optionable Resigns Over a Prison Record."  Therein, Mr. Marvin, in relevant

part, further revealed:

The shock resignation of the chief executive officer of Optionable Inc., the broker at the centre of BMO's natural-gas trading debacle,

was spurred by the revelation he has a prison record and failed to disclose it, according to reports.

Kevin Cassidy resigned from Optionable on Monday. Media reports said Mr. Cassidy's decision was prompted after questions surfaced about his role in a payment scam in the early 1990's that defrauded the U.S. government and led to him receiving a six-month jail sentence.

Mr. Cassidy is reported to have been a close friend of David Lee, the BMO natural-gas trader at the centre of the bank's bad natural-gas trades. Mr. Lee and BMO's executive head of commodity products Bob Moore have both been on leave since the bank first reported its trading losses, which are a record for a Canadian bank.

The revelations about Mr. Cassidy's past are the latest blow to the broker, which is reeling since it was first tied to BMO's $350-million to $450-million trading losses two weeks ago.

BMO was Optionable's biggest customer but the bank has now suspended that relationship. Also, the broker's biggest shareholder, the New York Mercantile Exchange, has pulled its representative from Optionable's board and is reviewing its investment in the company.

58.    Then on May 17, 2007, Bloomberg reported that Bank of Montreal was raising its

trading losses to C$680 million.  The article, in relevant part, stated:

Bank of Montreal, stung by the biggest trading loss in Canadian history, said the debacle will cost at least 50 percent more than originally forecast and started an investigation into potential ``irregularities.''    Canada's fourth-biggest bank will record pretax losses of C$680 million ($618 million) from trading natural gas, compared with an April 27 forecast of C$350 million to C$450 million, according to a statement today. Two New York-based bankers involved in the trades have left the firm.

* * *

The bank said the losses were bigger than it originally forecast after it adopted a different pricing model to better assess the value of its natural gas options contracts. The revision also reflects ``increased concerns'' about the reliability of quotes from its main broker, Optionable Inc. Chief Executive Officer William Downe, who took over the top spot on March 1, said the bank has taken steps to reduce the risk of the commodities portfolio by a third

from its peak, according to the statement. The bank said that New York traders David Lee and Bob Moore are no longer with the company, after being placed on leave following the losses.

\* \* \*

``BMO is continuing its investigation of the facts and circumstances surrounding these mark-to-market commodities trading losses including a review to determine whether any potential irregularities in trading and valuation took place,'' the bank said.

### PLAINTIFF'S CLASS ACTION ALLEGATIONS

59.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased the common stock of Optionable between May 9, 2005 and May 10, 2007, inclusive (the "Class Period") and who were damaged thereby.  Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

60.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Optionable's common stock was actively traded on the Over The Counter Bulletin Board ("OTCBB").  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Optionable or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

61.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

62.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

63.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

       (a)    whether the federal securities laws were violated by defendants' acts as alleged herein;

       (b)    whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Optionable; and

       (c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

64.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

65.    The market for Optionable's common stock was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and failures to disclose, Optionable's common stock traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired Optionable's common stock relying upon the integrity of the market price of Optionable's common stock and market information relating to Optionable, and have been damaged thereby.

66.    During the Class Period, defendants materially misled the investing public, thereby inflating the price of Optionable's common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

67.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about Optionable's financial well-being, business relationships, and prospects. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Optionable and its financial well-being, business relationships, and prospects, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the

Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

## LOSS CAUSATION

68.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

69.    During the Class Period, Plaintiff and the Class purchased common stock of Optionable at artificially inflated prices and were damaged thereby.  The price of Optionable's common stock significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

70.    As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Optionable, their control over, and/or receipt and/or modification of Optionable's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Optionable, participated in the fraudulent scheme alleged herein.

71.    Also, during the Class Period, and with the Company's stock trading at artificially inflated prices, Company insiders were able to sell 11,431,636 shares of Company stock for

gross proceeds of $29,614,153, including over $28 million in gross proceeds received by Defendants Cassidy, O'Connor, and Nordlicht. This inside trading is evidenced by the following chart:

| Date of Trade | Inside Trader | Number of Shares | Price per Share | Gross Proceeds |
|---|---|---|---|---|
| April 10, 2007 | Cassidy, Kevin | 1,905,000 | $5.29 | $5,124,450 |
| April 10, 2007 | O'Connor, Edward J. | 1,853,886 | $2.69 | $4,986,953 |
| April 10, 2007 | Nordlicht, Mark | 7,000,000 | $2.69 | $18,830,000 |
| December 6, 2005 | Lang, Rebecca | 158,750 | $1.00 | $158,750 |
| November 15, 2005 | Cassidy, Heather F. | 514,000 | $1.00 | $514,000 |
| | **TOTAL:** | **11,431,636 Shares** | | **$29,614,153 Gross Proceeds** |

## Applicability of Presumption of Reliance:
## Fraud On The Market Doctrine

72.    At all relevant times, the market for Optionable's common stock was an efficient market for the following reasons, among others:

(a)    Optionable's stock met the requirements for listing, and was listed and actively traded on the OTCBB, a highly efficient and automated market;

(b)    As a regulated issuer, Optionable filed periodic public reports with the SEC and the OTCBB;

(c)    Optionable regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting

services; and

(d)     Optionable was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

73.     As a result of the foregoing, the market for Optionable's common stock promptly digested current information regarding Optionable from all publicly-available sources and reflected such information in Optionable's stock price. Under these circumstances, all purchasers of Optionable's common stock during the Class Period suffered similar injury through their purchase of Optionable's common stock at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

74.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Optionable who knew that those statements were

false when made.

## FIRST CLAIM
### Violation of Section 10(b) of
### The Exchange Act and Rule 10b-5
### Promulgated Thereunder Against All Defendants

75.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

76.    During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Optionable's common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

77.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Optionable's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5.   All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

78.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Optionable's financial well-being, business relationships, and prospects, as specified herein.

79.    These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Optionable's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Optionable and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Optionable's common stock during the Class Period.

80.    Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

81.    The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Optionable's financial well-being, business relationships, and prospects from the investing public and supporting the artificially inflated price of its common stock.    As demonstrated by defendants' overstatements and misstatements of the Company's financial well-being, business relationships, and prospects throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

82.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Optionable's common stock was artificially inflated during the Class Period.   In ignorance of the fact that market prices of Optionable's common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the common stock trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by defendants, but not disclosed in public statements by defendants during the Class Period, Plaintiff and the other members of the Class acquired Optionable's common stock during the Class Period at artificially high prices and were damaged thereby.

83.    At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the

other members of the Class and the marketplace known the truth regarding the problems that Optionable was experiencing, which were not disclosed by defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Optionable common stock, or, if they had acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

84.    By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

85.    As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

**SECOND CLAIM**
**Violation of Section 20(a) of**
**The Exchange Act Against the Individual Defendants**

86.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

87.    The Individual Defendants acted as controlling persons of Optionable within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public

filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

88.    In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

89.    As set forth above, Optionable and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: May 17, 2007

**BRODSKY & SMITH, LLC**

By:*Evan J. Smith, Esquire (ES3254)*
Evan J. Smith, Esquire (ES 3254)
240 Mineola Boulevard
Mineola, NY 11501
(516) 741-4977
(516) 741-0626 (facsimile)

**SCHIFFRIN BARROWAY
TOPAZ & KESSLER LLP**
Richard A. Maniskas, Esquire
280 King of Prussia Road
Radnor, PA 19087
(610) 667-7706
(610) 667-7056

*Attorneys for Plaintiffs*