UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In re OPTIONABLE SECURITIES LITIGATION

This Paper Applies to:              All Cases                          07 Civ. 3753 (LAK)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MEMORANDUM OPINION**

Appearances:

> Kim E. Miller
> Lewis S. Kahn
> Kahn Gauthier Swick, LLC
> *Attorneys for Plaintiffs*

> Michael G. Bongiorno
> Wilmer Cutler Pickering Hale and Dorr LLP
> *Attorneys for Defendant Optionable, Inc.*

> Paul E. Dans
> Edwards Angell Palmer & Dodge LLP
> *Attorneys for Defendant Marc-Andre Boisseau*

> Lawrence R. Gelberg
> *Attorney for Defendant Kevin Cassidy*

> Peter J. Pizzi
> Christine I. Gannon
> Susan Kwiatkowski
> Connell Foley LLP
> *Attorneys for Defendant Albert Helmig*

> Eliott Lauer
> Daniel R. Marcus
> Rachel Yocum
> Curtis, Mallet-Prevost, Colt & Mosle LLP
> *Attorneys for Defendant Mark Nordlicht*

2

Liam O'Brien
Jeffrey B. Silverstein
McCORMICK & O'BRIEN, LLP
*Attorneys for Defendant Edward J. O'Connor*

LEWIS A. KAPLAN, *District Judge.*

This matter is before the Court on motions by defendants to dismiss the Consolidated Amended Class Action Complaint (the "Complaint") on the ground that it fails to state a claim upon which relief may be granted and fails to allege fraud with the particularity required by Section 21D-4(b) of the Private Securities Litigation Reform Act (the "PSLRA")[1] and Fed. R. Civ. P. 9(b).[2]

*Facts*

This is an action against Optionable, Inc. ("Optionable") and five individual defendants for alleged violations of Section 10(b), 20(a) and 20A of the Securities Exchange Act of 1934 (the "Exchange Act")[3] and Rule 10b-5 thereunder.[4]

---

[1]  Pub. L. No. 104-67, 109 Stat. 737 (1995).

[2]  Defendants have filed six motions supported by memoranda totaling 169 pages and copious exhibits.  Their memoranda are largely duplicative.  This was an inappropriate imposition on the Court and on opposing counsel.  Plaintiffs behaved little better, filing a single 80 page responsive memorandum as three separate submissions without leave of the Court.

[3]  15 U.S.C. §§ 78j(b), 78t(a), 78t-1.

[4]  17 C.F.R. § 240.10b-5 (200).

3

I.      *The Parties*

The lead plaintiff is KLD Investment Management, LLC.  It purports to represent a class of all individuals and entities who purchased Optionable securities between January 22, 2007, and May 14, 2007, (the "Class Period").

Optionable is a brokerage services provider specializing in energy derivatives.

Defendant Mark Nordlicht a founder and its chairman from 2000 until April 2007.[5]

Defendant Kevin Cassidy was Optionable's chief executive officer and vice chairman between March 2001 and March 2004 and again between October 2005 and his resignation in May 2007 and served as a consultant in the intervening period.  He allegedly was convicted of credit card fraud in 1997 and tax evasion in 1993.[6]  Plaintiffs suggest, but do not allege, that Cassidy served as a consultant for Optionable from April 2004 to September 2005 to avoid reporting these convictions in Optionable's IPO Registration Statement.[7]

Defendant Edward J. O'Connor has been president of Optionable since March 2001.[8]

Defendant Albert Helmig was a director of the company from September 2004 until November 2007.  He served also on the board of Platinum Energy, a company founded and chaired by Nordlicht.[9]

---

[5]     Cpt. [DI 79] ¶ 6(a).

[6]     *Id.* ¶¶ 6(b), 16.

[7]     *Id.* ¶ 16.

[8]     *Id.* ¶ 6(c).

[9]     *Id.* ¶ 6(d).

4

Defendant Marc-Andre Boisseau has been chief financial officer of Optionable since December 2004.[10]

Plaintiffs allege that defendants Cassidy, O'Connor, and Nordlicht collectively controlled 50 percent of Optionable's common stock and held three of its four board seats. The fourth seat was held by defendant Helmig, who, according to the Complaint, was not independent because of his position at Platinum Energy.[11]

## II.    *Factual Allegations*

Before turning to the allegedly false and misleading statements, it is useful to outline plaintiffs' claims of deception. The Complaint makes the following factual allegations.

Optionable offers over-the-counter ("OTC") natural gas and energy derivatives trading and brokerage services, energy futures derivatives services, and voice and floor brokerage services at the New York Mercantile Exchange ("NYMEX"). It charges commissions for these services and, if a transaction is executed through NYMEX, receives incentive payments from the exchange. Among its services, Optionable finds counterparties for energy trades – matching buyers with sellers. In such transactions, it charges a commission to both parties to the trade.[12]

In 2006, Optionable expanded its services by launching OPEX, an electronic trading

---

[10]      *Id.* ¶ 6(e).

[11]      *Id.* ¶ 20.

[12]      *Id.* ¶¶ 5.

platform to automate the trading of energy derivatives between counterparties.[13]  Plaintiffs allege,

however, that OPEX was not a "viable" platform[14] and that defendants Cassidy, Nordlicht, and

O'Connor knew that OPEX "was a sham."[15]

The Bank of Montreal ("BMO") was Optionable's biggest client during, and for some

time prior to, the class period, during which it placed natural gas options trades through

Optionable.[16]  Plaintiffs allege that 80 percent or more of Optionable's first quarter 2007 revenues

were derived from transactions involving BMO.[17]   Plaintiffs allege further that Optionable

collaborated with David Lee, a BMO natural gas trader, to misprice some of the transactions it

executed for BMO.[18]  According to the Complaint, defendant Cassidy had a "personal relationship"

with Robert Moore, BMO's executive managing director of commodity products, and Lee.[19]

Moore's son is said to have worked as a summer intern for Optionable and Capital Energy, a

---

[13]

Id. ¶¶ 5, 11.

[14]

Id. ¶¶ 18, 24, 29.

[15]

Id. ¶ 10.

[16]

Id. ¶ 7.

[17]

Id. ¶ 14; also id. ¶¶ 10, 12, 29, 31.

[18]

See id. ¶ 10 ("Defendants had engaged in a scheme to grossly misprice options with BMO"); id. ¶ 12 ("Optionable's 'record results' were . . . a result of its gross mispricing of deals with [BMO]."); id. ¶ 24 ("gross mispricing practices"); id. ¶ 29 ("gross mispricing of options"); id. ¶¶ 33, 43 (collaboration with Lee).

[19]

Id. ¶¶ 7, 49.

6

company owned by defendants Cassidy and O'Connor.[20]  And Optionable is alleged to have made payments to Lee and Lee's sister.

On January 22, 2007, Optionable announced an agreement among itself, Nordlicht, Cassidy, O'Connor, and NYMEX.  It provided that NYMEX would acquire a 19 percent stake in Optionable by purchasing stock for $2.69 per share from defendants Nordlicht, Cassidy, and O'Connor and, after the acquisition, would be entitled to designate one person to Optionable's board.[21]

The deal closed on April 10, 2007.[22]  Thereafter, Ben Chesir, NYMEX's VP of New Product Development, joined Optionable's board.[23]  Plaintiffs allege that the defendants entered into the transaction to dilute plaintiffs' interest in Optionable and pocket over $29 million.[24]

On April 27, 2007, BMO informed investors that it had sustained between C$350 and C$450 in losses from natural gas options trades.[25]  Sometime later, BMO placed Lee and Moore on leave pending an investigation into the losses.[26]  And on May 8, 2007, BMO announced that it was

---

[20]
    *Id*. ¶¶ 7, 49.

[21]
    *Id*. ¶ 9.

[22]
    *Id*. ¶ 47.

[23]
    *See id*. ¶¶ 29; 46.

[24]
    *Id*. ¶ 26.

[25]
    *Id*. ¶ 34.

[26]
    *See id*. ¶¶ 39, 43.

"suspending all of its business relationships" with Optionable.[27]  Plaintiffs allege that BMO's loss

generating trades were made through Optionable.[28]

The next day, NYMEX announced that it would launch an electronic trading platform

– CME Globex – in June 2007 that would compete with the OPEX platform.[29]  A short time later,

Chesir resigned form Optionable's board.[30]

III.    *The Allegedly False and Misleading Statements*

The Complaint alleges that the defendants made false and misleading statements on

seven occasions during the class period.[31]  Several of the allegedly false and misleading statements

related to the quality of Optionable's brokerage services[32] and several discussed Optionable's

revenue.[33]

---

[27]

Id. ¶ 39.

[28]

See id. ¶ 34.

[29]

Id. ¶ 8.

[30]

Id. ¶¶ 29, 46.

[31]

Id. ¶ 9 (Optionable's January 22, 2007, report on Form 8-K); id. ¶ 11 (February 6, 2007, press release); id. ¶¶ 13, 15, 17, 19, 21, 23 (Optionable's March 23, 2007, report on Form 10-KSB); id. ¶ 25 (April 10, 2007, press release); id. ¶ 27 (May 1, 2007, conference call in which all the individual defendants but for Nordlicht participated); id. ¶ 30 (May 8, 2007, statement by defendant Helmig); id. ¶ 32 (May 9, 2007, press release).

[32]

Id. ¶¶ 9, 11, 27, 32 (positive statements about Optionable's brokerage services).

[33]

Id. ¶¶ 13, 27, 30 (statements that BMO contributed approximately 24% of revenue and could be replaced); id. ¶¶ 9, 11 (statements about Optionable's revenue potential).

Plaintiffs contend that statements in Optionable's 2006 10-KSB were false and misleading, including statements that: (1) described Cassidy's background,[34] (2) described the OPEX platform,[35] (3) characterized Optionable's disclosure controls and procedures as "effective,"[36] and (4) certified that the report did not contain any untrue or misleading statements.[37]

Plaintiffs allege also that Optionable's April 10, 2007 statement – that the transaction with NYMEX was "a major strategic step" that would be "an important catalyst in helping drive and accelerate [Optionable's] future growth" – was false and misleading.[38]

Finally, plaintiffs allege that many of Cassidy's statements on a May 1, 2007 conference call were false. Specifically, they challenge his statements that: (1) "[Lee] has no ownership in [Optionable] and no relationship, besides a broker/client relationship," (2) he did not expect BMO to cut its ties with Optionable, and (3) there was no danger of NYMEX building a platform that would compete with OPEX.[39]

---

[34]    *Id.* ¶ 15.

[35]    *Id.* ¶ 17.

[36]    *Id.* ¶¶ 19; 21.

[37]    *Id.* ¶ 23.

[38]    *Id.* ¶ 25.

[39]    *Id.* ¶ 27.

*Discussion*

I.    *Standard Governing Motions to Dismiss*

In deciding a motion to dismiss, the Court ordinarily accepts as true all well-pleaded factual allegations and draws all reasonable inferences in the plaintiffs' favor.[40]  In order to survive such a motion, however, "the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'"[41]

Although this motion is addressed to the face of the pleadings, the Court may consider also the full text of "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."[42]  Defendants have submitted many exhibits in support of their motion, including the text of SEC filings and press releases referred to in the Complaint. The Court considers those documents that the Complaint effectively incorporates by reference or are amenable to judicial notice.

As this is a securities fraud case, the complaint must satisfy the heightened pleading requirements of Rule 9(b) and the PSLRA.  It must state the circumstances constituting fraud with particularity.  In particular, it "must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4)

---

[40]      *Levy v. Southbrook Int'l Invs., Ltd.*, 263 F.3d 10, 14 (2d Cir. 2001), *cert. denied*, 535 U.S. 1054 (2002).

[41]      *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 127 S.Ct. 1955, 1965 (2007)); *see also Iqbal v. Hasty*, 490 F.3d 143, 158-59 (2d Cir. 2007) (declining to limit *Bell Atl.* holding to the antitrust context).

[42]      *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S.Ct. 2499, 2509 (2007) (citing 5B CHARLES ALAN WRIGHT & ARTHUR MILLER, FEDERAL PRACTICE AND PROCEDURE: CIVIL § 1357 (3d ed. 2004 and Supp. 2007); *see also Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002).

explain why the statements were fraudulent."[43]  And where an allegation regarding a misstatement

or omission is made on information and belief, "the complaint shall state with particularity all facts

on which that belief is formed."[44]  Finally, the complaint must "state with particularity facts giving

rise to a strong inference that the defendant acted with the required state of mind."[45]


II.    *Plaintiffs' Section 10(b) Claims*

   A.    *Elements of a Section 10(b) Claim*

         Section 10(b) makes it unlawful "for any person, directly or indirectly . . . [t]o use

or employ, in connection with the purchase or sale of any security . . ., any manipulative or deceptive

device or contrivance in contravention of such rules and regulations as the Commission may

prescribe as necessary or appropriate in the public interest or for the protection of investors."  Rule

10b-5 in turn provides:

         "It shall be unlawful for any person . . .

---

[43]
   *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir.) *cert. denied*, 531 U.S. 1012 (2000); *accord In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 69-70 (2d Cir.), *cert. denied*, 534 U.S. 1071 (2001).

[44]
   15 U.S.C. § 78u-4(b)(1).  The requirement of stating "all facts" is not applied literally.  *See Novak*, 216 F.3d at 313-14.

   In this case, defendants assert that all of plaintiffs allegations (presumably excluding those concerning their own activities) are made on information and belief because plaintiffs neither allege nor were in a position to have personal knowledge.  DI 90, at 12 n.6  Plaintiffs' answering papers do not dispute this.

[45]
   15 U.S.C. § 78u-4(b)(2).  The required state of mind is "an intent to deceive, manipulate, or defraud."  *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 168 (2d Cir. 2000) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976) (internal quotation marks omitted)); *accord Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001).

"(a)    To employ any device, scheme, or artifice to defraud,

"(b)    To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

"(c)    To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

"in connection with the purchase or sale of any security."[46]

To state a claim based on a misrepresentation or omission in violation of Rule 10b-5, as plaintiffs purport to do here, one must allege that a defendant "(1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury."[47]

### B.    Allegations that Statements were Materially Misleading

Defendants argue that plaintiffs have not pleaded with particularity facts sufficient to support the belief that defendants' statements were materially misleading.  Plaintiffs, however, contend that they have alleged sufficiently that defendants' statements misrepresented or concealed material facts, including that: (1) Optionable had a scheme to misprice BMO's options, (2) BMO accounted for more than 24 percent of Optionable's revenue, (3) Cassidy has a criminal record, (4) the OPEX platform was not transparent, (5) Optionable's internal controls were ineffective, (6) the

---

[46]    17 C.F.R. § 240.10b-5 (2007).

[47]    *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir.) (quoting *In re IBM Corp. Sec. Litig.*, 163 F.3d 102, 106 (2d Cir.1998) (internal quotation marks omitted)), *cert. denied,* 546 U.S. 934 (2005); *accord Ganino*, 228 F.3d at 161.

2006 10-KSB form was accurate, (7) Optionable's transaction with NYMEX was not a strategic step or an important catalyst, (8) Lee and Cassidy had a personal relationship, (9) Cassidy expected BMO to cut its ties with Optionable, and (10) there was a danger that NYMEX would build a platform to compete with OPEX.

Plaintiffs must do more than allege that statements were materially misleading – "they must demonstrate with specificity why and how that is so."[48]  Where, as here, factual allegations are made on information and belief, the complaint must allege adequate bases for the allegations.[49]  It "must identify sufficiently the sources upon which [plaintiffs'] beliefs are based and those sources must have been likely to have known the relevant facts."[50]  Moreover, the factual allegations that are based on adequate sources must justify plaintiffs' conclusion that defendants' statements were materially misleading.[51]

1.    Statements Regarding Quality of Brokerage Services

Plaintiffs allege, on information and belief, that defendants' statements regarding the quality of Optionable's brokerage services were misleading because they concealed that Optionable

---

[48]

*Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004); *see In re IAC/InterActiveCorp Sec. Litig.*, 478 F. Supp. 2d 574, 591 (S.D.N.Y. 2007).

[49]

*See Novak*, 216 F.3d at 306 (quoting 15 U.S.C. § 78u-4(b)(1)); *see also In re IAC/InterActiveCorp*, 478 F. Supp. 2d at 591.

[50]

*Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC*, 376 F. Supp. 2d 385, 395 (S.D.N.Y. 2005).

[51]

*In re NTL, Inc. Sec. Litig.*, 347 F. Supp. 2d 15, 23 (S.D.N.Y. 2004); *Fraternity Fund Ltd.*, 376 F. Supp. 2d at 395.

had a scheme to misprice BMO's allegedly options.[52]   They rest this allegation on subsidiary allegations that: (1) BMO said that its losses stemmed from trades made through Optionable,[53] (2) Optionable provided some of the prices used in BMO's mismarked trades,[54] (3) BMO's auditors questioned the reliability of Optionable's quotes,[55] (4) BMO suspended trading with Optionable,[56] (5) Lee and Lee's sister received payments from Optionable,[57] and (6) Moore's son worked as a summer intern at Optionable and Capital Energy.[58] Many of these assertions, however, are not supported by the sources on which they purport to be based.

Plaintiffs rely on a BMO press release to support the claim that "BMO informed investors . . . that it had between $350 million and $450 million (Canadian) in trading losses stemming from natural gas options trades made through Optionable."[59]  In fact, however, the BMO press release did not say that.  While it announced the projected trading losses, it went on – in language omitted from plaintiffs' partial quotation in the Complaint – to say:

---

[52]

Cpt. ¶¶ 10, 12, 29, 33.

[53]

*See id.* ¶ 34.

[54]

*See id.* ¶ 43.

[55]

*See id.* ¶ 48.

[56]

*See id.* ¶ 39.

[57]

*See id.* ¶ 7.

[58]

*See id.* ¶¶ 7, 49.

[59]

*Id.* ¶ 34.

> "A number of factors contributed to these mark-to-market commodity trading losses. During the quarter, positions held by BMO Financial Group in the energy market, primarily for natural gas, were negatively impacted by changes in market conditions. In particular, the market became increasingly illiquid and volatility dropped to historically low levels. In conjunction with this, there was a refinement in BMO's approach to estimating the market value of this portfolio."[60]

Thus, plaintiffs first allegation is contradicted by its alleged source.

The second and third claims rely on newspaper articles purporting to describe a report compiled by Deloitte and Touche, LLP, ("Deloitte"), BMO's forensic auditors.[61]  "'[N]ewspaper articles should be credited only to the extent that other factual allegations would be – if they are sufficiently particular and detailed to indicate their reliability.  Conclusory allegations of wrongdoing are no more sufficient if they come from a newspaper article than from plaintiff's counsel . . . .'"[62]         The first article describes the content of the Deloitte report on the basis of "a source familiar with the report;" the second article does not identify a basis for its description.[63] Plaintiffs argue that these nevertheless are sufficient sources because the newspapers are credible and the reporters diligent.[64]  But the articles provide no basis for believing that the unidentified source is likely to have known the relevant facts about the Deloitte report, and the allegations made in the article lack specificity.  Nonetheless, for purposes of this motion, the Court will assume that

---

[60]

Bongiorno Decl. [DI 91] Ex. K.

[61]

Cpt. ¶¶ 43; 48.

[62]

*In re Wet Seal, Inc. Sec. Litig.*, 518 F. Supp. 2d 1148, 1172 (C.D.Cal. 2007) (quoting *In re McKesson HBOC Secs. Litig.*, 126 F. Supp. 2d 1248, 1272 (N.D.Cal. 2000)).

[63]

*See* Cpt. ¶¶ 43; 48; Bongiorno Decl. Exs. L & N.

[64]

DI 106, at 8.

15

plaintiffs have identified an adequate source for their claim that Optionable provided *some* inaccurate prices to BMO, as the articles support only this limited allegation. The articles do not attribute BMO's losses to Optionable's mispricing[65] or suggest that Optionable purposely gave inaccurate prices.

The allegation that BMO suspended its relationship with Optionable is based on an announcement by BMO.[66] This source is sufficient to support plaintiffs' allegation.

Plaintiffs fifth claim – that Lee and Lee's sister received payments from Optionable – is based on the word of a Confidential Witness, identified as an "analyst who followed Optionable during the relevant time period."[67] Plaintiffs have identified their source, but this is not sufficient. In addition to identifying the source, the source must be shown to have been likely to know the relevant facts.[68] There is no reason to believe that "an analyst" is likely to have known the relevant facts. Moreover, the allegation lacks detail that might suggest that this analyst had personal knowledge. For example, the allegation does not describe the time, amount, or method of payment.

Plaintiffs have identified no source for their claim that Moore's son worked as a summer intern at Optionable and Capital Energy. They explain that the claim is based on

---

[65]      In fact the May 10, 2007, article includes a paragraph – omitted from the Complaint – that attributes the losses to other sources: "[BMO's CEO] said the bank has refined its method of estimating the value of its book and also blamed the losses on a drying up of liquidity and flattening out of natural gas prices." Bongiorno Decl. Ex. L.

[66]      Cpt. ¶ 39.

[67]      *Id.* ¶ 7.

[68]      *Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC*, 376 F. Supp. 2d 385, 395 (S.D.N.Y. 2005); *In re NTL, Inc. Sec. Litig.*, 347 F. Supp. 2d 15, 23 (S.D.N.Y. 2004).

"[p]laintiffs investigation,"[69] but that bald assertion in itself is not a sufficient basis. "Allegations based on the investigation of counsel are deemed to be made on 'information and belief.'"[70]

The next question is whether the facts alleged, to the extent they are based on adequate sources, support plaintiffs' inference that Optionable had a scheme to misprice BMO's options so that defendants' statements regarding the quality of Optionable's services were materially misleading.

Only a few of plaintiffs' subsidiary allegations are supported by adequate sources – viz. that BMO suspended its relationship with Optionable and that Optionable provided *some* inaccurate prices to BMO. These allegations do not support the view that Optionable had a scheme to misprice BMO's options. Plaintiffs therefore have not alleged with particularity that defendants' statements about the quality of Optionable's services were materially misleading.

### 2.     Statements Regarding Optionable's Revenue

Plaintiffs allege that defendants' statements describing Optionable's revenue were materially misleading because they did not disclose that BMO, in addition to paying a commission directly to Optionable, contributed to Optionable's revenue indirectly through the commissions paid by BMO's counterparties and incentive payments received from NYMEX.[71]

---

[69]

Cpt. ¶ 49.

[70]

*Malin v. XL Capital Ltd.*, 499 F. Supp. 2d 117, 136 n.16 (D.Conn. 2007). "[T]he phrase 'investigation of counsel' is meaningless. . . . '[N]o amount of investigation can transform information and belief-hearsay, essentially-into personal knowledge.'" *Id.* (quoting *In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 356 n.32 (S.D.N.Y. 2003)).

[71]

Cpt. ¶¶ 10, 12, 14, 29, 31.

Optionable's Form 10-KSB stated that "[o]ne of our clients, Bank of Montreal, accounted for 24% and 18% of our revenues during 2006 and 2005 respectively."[72]  Defendants argue that this statement was not misleading because other statements in the Form explained that Optionable charged commissions to both sides of a transaction and received incentive payments for deals executed on NYMEX.  Reading the 10-KSB as a whole, defendants argue, Optionable's statement that BMO accounted for 24 percent of its revenues was not misleading.

"If . . . allegations of securities fraud conflict with the plain language of the publicly filed disclosure documents, the disclosure documents control, and the court need not accept the allegations as true."[73]  Setting aside such allegations, plaintiffs fail to allege that defendants' statements regarding Optionable's sources of revenue were false or misleading with regard to a material fact.

### 3.    Statement Describing Cassidy's Background

Plaintiffs allege, on information and belief, that Optionable's description of Cassidy in its 2006 10-KSB was misleading because it concealed a material fact, viz. that Cassidy had been convicted of credit card fraud and tax evasion in 1997 and 1993.[74]  It is not sufficient that plaintiffs have alleged that the undisclosed information was material.  "[A] corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact. Rather,

---

[72]

      *Id.* ¶ 13.

[73]

      *Sedighim v. Donaldson, Lufkin & Jenrette, Inc.*, 167 F. Supp. 2d 639, 646-47 (S.D.N.Y. 2001).

[74]

      Cpt. ¶ 16.

an omission is actionable under the securities laws only when the corporation is subject to a duty to disclose the omitted facts."[75]

Optionable was obliged to disclose in its Form 10-KSB the information specified in Item 401 of Regulation S-B.[76]  Item 401 requires disclosure of certain legal proceedings during the past five years that are "material to an evaluation of the ability and integrity" of its officers and directors, including a conviction in a criminal proceeding.[77]

Optionable made the following disclosure regarding Cassidy:

"Mr. Cassidy has served as our Chief Executive Officer since October 2005 and from March 2001 to March 2004.  From April 2004 through September 2005, Mr. Cassidy provided consulting services to us . . . .  Mr. Cassidy's primary responsibilities include business development, stales and marketing, and oversight of our brokerage operations."[78]

Defendants claim that this was inadequate because it did not disclose that Cassidy had been convicted of crimes in 1997 and 1993.  But the regulations did not require that to be disclosed, and that information was not necessary to make other statements not false or misleading.  Defendants therefore were under no duty to disclose this information.  Plaintiffs have failed to state a 10b-5 claim with regard to this statement.

---

[75]

In re Time Warner Inc. Sec. Litig., 9 F.3d 259, 267 (2d Cir. 1993); also Glazer v. Formica Corp., 964 F.2d 149, 156 (2d Cir. 1992) (quoting Backman v. Polaroid Corp., 910 F.2d 10, 12 (1st Cir. 1990) (en banc)).

[76]

Item 9 of Form 10-KSB requires disclosure of the information specified in Item 401.

[77]

17 C.F.R. § 228.401(a), (d).

[78]

Cpt. ¶ 15.

4.      *Statements Regarding Motivation for NYMEX Transaction*

Plaintiffs allege, on information and belief, that Cassidy's statement that the NYMEX transaction was "a major strategic step" that will be "an important catalyst in helping drive and accelerate our future growth" was false when made.[79]  Plaintiffs attempt to justify this allegation by offering another unsupported conclusory allegation: "the [NYMEX] transaction simply enabled the Individual Defendants to pocket over $29 million."  Plaintiffs' conclusory assertion that Cassidy's statement was false is not sufficient.[80]

5.      *Statement Regarding Lee's Relationship with Optionable*

Plaintiffs allege, on information and belief, that Cassidy's statement that "[Lee] has no ownership in [Optionable] and no relationship, besides a broker/client relationship" was false.[81]  Plaintiffs contend that Lee and Cassidy were "close personal friends,"[82] but they have not identified a basis for this belief.  The only factual assertion which might justify a conclusion that Lee and Cassidy were friends – that Lee and Lee's sister received payments from Optionable – is not based on an adequate source, as discussed above.

---

[79]
    *Id.* ¶ 26.

[80]
    *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007) (citing *Luce v. Edelstein*, 802 F.2d 49, 54 (2d Cir.1986)).

[81]
    Cpt. ¶ 29.

[82]
    *See id.*

      6.      *Statement Denying that BMO would End Relationship with Optionable*

Plaintiffs allege, on information and belief, that Cassidy's May 1, 2007 statement that he did not expect BMO to cut its ties with Optionable was false.[83]  They rest this allegation on subsidiary allegations that: (1) defendants knew Deloitte's report had "exposed the mispricing scheme," (2) Cassidy had a personal relationship with Lee and Moore, and (3) Cassidy had an undisclosed criminal history.[84]

Plaintiffs first allegation is flawed in at least two respects.  Plaintiffs do not identify a basis for their belief either that defendants knew about the Deloitte report or that the Deloitte report exposed the mispricing scheme.  The only source identified by plaintiffs that purports to describe the Deloitte report – the May 10, 2007, newspaper article[85] – had not been published at the time of Cassidy's statement and does not describe the Deloitte report as exposing a mispricing scheme.

The allegation that Cassidy had personal relationships with Lee and Moore are based on the same sources – a confidential witness and plaintiffs' investigation – that were found to be inadequate earlier.

Plaintiffs remaining allegation, that Cassidy had an undisclosed criminal history, is not sufficient to support an inference that Cassidy knew – on May 1, 2007 – that BMO would end its relationship with Optionable.

---

[83]

      *Id*.

[84]

      *See id*. ¶ 29.

[85]

      *Id*. ¶ 43.

       7.      *Statement Denying that NYMEX Might Compete with OPEX*

Plaintiffs allege, on information and belief, that Cassidy's statement that there was no danger of NYMEX building a platform that would compete with OPEX was false.[86]  The only factual allegation offered to support this inference is that Ben Chesir, NYMEX's VP of New Product Development, served on Optionable's board.[87]  This fact is insufficient to support an inference that Cassidy knew NYMEX might compete with OPEX.

       8.      *Derivative Statements: Statements Regarding Effectiveness of Optionable's Internal Controls, Accuracy of Form 10-KSB, and Transparency of OPEX*

Plaintiffs allege, on information and belief, that defendants' statements characterizing Optionable's internal controls as "effective," certifying the accuracy of the 10-KSB Form, and describing OPEX as a transparent were false.[88]  The allegation that these statements were false is based on subsidiary allegations that (1) Optionable had a scheme to misprice BMO's options, (2) concealed Cassidy's criminal record, and (3) understated BMO's contribution to Optionable's revenue.  Plaintiffs argue that these alleged facts demonstrate that Optionable did not have effective internal controls, that the 10-KSB report was false and misleading, and that OPEX was not a transparent platform.  As described above, plaintiffs have not pled sufficiently the subsidiary allegations on which they rely.

---

[86]

    *Id.* ¶ 29.

[87]

    *See id.*

[88]

    *Id.* ¶¶ 20, 22, 24.

\*   \*   \*

Plaintiffs have not pleaded with particularity facts sufficient to support their allegation that defendants' statements were materially misleading.  Many of plaintiffs' factual allegations are not based on an adequate source or are unsupported by the purported source.  Those allegations that are based on adequate sources do not support the inference that defendants' statements were false of misleading with regard to a material fact.  For the foregoing reasons, the complaint fails to state the circumstances constituting fraud with particularity as required by Rule 9(b) and the PSLRA.

III.    *Plaintiffs' Section 20(a) Claims*

Plaintiffs assert also claims under Section 20(a) of the Exchange Act[89] against the individual defendants.  Section 20(a) claims necessarily are predicated on a primary violation of securities law and impose 'control person' liability on individual defendants.[90]  Because plaintiffs have failed to state a claim for a primary violation of Section 10(b) of the Exchange Act, their Section 20(a) claim must be dismissed against all defendants.

---

[89]    15 U.S.C. § 78t(a).

[90]    *Rombach v. Chang*, 355 F.3d 164, 177-78 (2d Cir. 2004).

23

*Conclusion*

For the foregoing reasons, defendants' motions to dismiss the amended complaint [docket items 81, 87, 89, 92, 95, and 98] are granted. Plaintiffs' request for leave to amend[91] is denied without prejudice to a motion for leave to amend, filed on or before October 6, 2008, supported by a proposed amended complaint.

SO ORDERED.

Dated:        September 15, 2008

Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)

---

[91]        Plaintiffs requested leave to amend in a footnote of their memorandum. DI 105, at 30 n.20.